# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2021-KA-00973-SCT

*JOSEPH EARL BLAND a/k/a JOSEPH BLAND*
*a/k/a JOSEPH E. BLAND*

*v.*

*STATE OF MISSISSIPPI*


| | |
|---|---|
| DATE OF JUDGMENT: | 04/16/2021 |
| TRIAL JUDGE: | HON. CHARLES E. WEBSTER |
| TRIAL COURT ATTORNEYS: | RICHARD B. LEWIS |
| | WILBERT LEVON JOHNSON |
| | MICHAEL STEPHEN CARR |
| | ROSHARWIN LEMOYNE WILLIAMS |
| | STEPHANIE ALEXIS BROWN |
| | WILLIAM HARVEY GRESHAM, JR. |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: GEORGE T. HOLMES |
| | JUSTIN TAYLOR COOK |
| ATTORNEY FOR APPELLEE | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON KAY HARTMAN |
| DISTRICT ATTORNEY: | BRENDA FAY MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/08/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |


**EN BANC.**

**BEAM, JUSTICE, FOR THE COURT:**

¶1.     A Tunica County jury found Joseph Earl Bland guilty of first-degree murder after he shot and killed his girlfriend, Olletta Jones. Bland appeals his conviction, claiming the trial court erred by excluding Bland's testimony regarding his post-traumatic stress disorder

(PTSD), thereby depriving him of the right to assert his defense. Finding no error in the trial court's decision, we affirm Bland's conviction.

## FACTS AND PROCEDURAL HISTORY

¶2. On February 23, 2017, Willie West woke up around 5:00 a.m. to the sound of a car alarm. From his front door, West saw a man and a woman standing near each other at the rear passenger side of a car parked in the middle of the road. They appeared to be talking, but West could not hear what they were saying. West saw the woman move away from the man and walk around the front of the car and try to get into the car on the driver's side. West then saw three flashes come from the man's hand and watched the woman fall to the ground.

¶3. After the woman fell, West cried out that the man had "shot her." At that point, West's son pulled West back into the house, and West called 911.

¶4. Officers with the Tunica County Sheriff's Department arrived at the scene minutes later. Jones was found deceased lying face down on the pavement next to the opened driver's side door of a Chevy Volt. Bland was still at the scene. After the officers realized Bland was involved, they called the Mississippi Highway Patrol to assist due to Bland's familial relationship with one of their deputies.

¶5. Lieutenant Bryant Sullivant with highway patrol conducted the investigation. He found three spent shell casings outside the vehicle and recovered a .45 caliber semi-automatic pistol from the back seat of the vehicle.

¶6. A gunshot-residue test was performed on Bland's hands and sent to the Mississippi Crime Lab. Gunshot residue was identified on the samples taken from Bland's right hand, right palm, and the back of his left hand.

¶7. Dr. Lisa Funte performed Jones's autopsy. She testified at trial that Jones died of multiple gunshot wounds. Two bullet projectiles were removed from Jones's body during the autopsy, and a third bullet projectile was found inside the body bag used to transport Jones's body to the medical examiner's office.

¶8. Bland testified at trial that Jones was shot in self-defense. According to Bland, he had bought the .45 caliber pistol about a month prior to the shooting and kept it in his possession most of the time. He kept the gun under the driver's seat when he was driving and under the passenger's seat when he was a passenger.

¶9. Bland said that after he got off work from Sam's Town Casino the night of the shooting, he went home to the apartment he shared with Jones. Jones wanted to go gambling, and she drove the two of them to the Hollywood Casino. Bland placed his gun underneath the passenger's seat.

¶10. After gambling at the casino, Bland drove back to the apartment to get more money while Jones remained at the casino. Bland said he forgot to remove his gun from underneath the passenger's seat and place it under the driver's seat. When Bland returned to the casino, he sat with Jones as she gambled. He then told Jones he was going to sit in the car and get some rest because he had to be at his second job a few hours later.

¶11. According to Bland, Jones came out of the casino approximately ten or fifteen minutes later, and the two of them left. Bland drove the car, and he and Jones began to argue about who was going to use the car the next day. The argument escalated when Bland commented to Jones that she "wasn't a good woman" and "that's the reason why she do[es]n't have custody over her children." Bland said this was like a "gut punch" to her. Bland said he glanced over at Jones and noticed a little movement but "didn't know what she was doing." He said that Jones "had the firearm drawn on me," pointed it at his head, and said, "I'm gonna kill you." He said Jones pulled the trigger, "and I heard the gun click."

¶12. Bland testified that Jones recocked the gun, and

> that's when I had lunged over there where the gun - - where she had the gun at, you know, like trying to keep her from doing what her action was, and then, like, during the time where I was, you know, like driving the car, I was swerving a little bit over in the lane, but then, you know, during that little tussle right there, that's when the firearm went off, and like I said, it hit her in the leg - -

¶13. Bland said that as the car came "to a halt," he was still trying to stop Jones from shooting him. He said Jones got out of the car with the gun in her hand "trying to - - attempting to shoot me, that's when I went into pursuit after her, to try to get the firearm from her before she actually learned how to load the gun." Bland said they eventually met up at the driver's side door and tussled for the gun Bland said Jones still had in her hand.

¶14. When asked by defense counsel if Bland remembered ever shooting the gun at Jones, Bland replied,

> I mean during that moment when we were tussling, it just was in that instant [sic]. That's when, you know, the firearm went off, like, in an instant, but I just - - when I started to come to of what started happening, like, just really

4

started to grasp of what's going on, I looked at the firearm, and the firearm was in a discharged position - -

¶15.    Prior to Bland's testimony, defense counsel had informed the trial court that Bland potentially would bring up that he suffers from PTSD, having witnessed his father murdered when Bland was four years old. Defense counsel submitted that this condition impacted Bland's actions the night of the shooting.

¶16.    Defense counsel acknowledged that they had not filed an insanity defense and reiterated that Bland had been found competent to stand trial. But defense counsel wanted a ruling from the trial court as to whether Bland could bring up the fact that he had witnessed his father's death at four years old "as a, I assume, less than perfect self-defense defense in this case."

¶17.    The trial court asked if the defense had any medical witnesses or documentation. Defense counsel said they had none but submitted that Bland had been in therapy since the shooting and that Bland had informed counsel that he was at that time on medication for PTSD.

¶18.    The State argued that whether or not Bland witnessed the death of his father was not relevant and would only mislead the jury or provoke sympathy for the defendant about an event that he may have witnessed.

¶19.    When asked by the trial court how this was relevant, defense counsel said that this testimony would go to Bland's state of mind at the moment he was confronted with deadly force, "a weapon pointed at his head [that] went 'click.' The moment that he heard that, that triggered whatever trauma he previously experienced."

5

¶20. The trial court replied, "you're getting into a lot of psychoanalytical issues when, as far as I know, nobody in the courtroom is qualified to give opinions on." The trial court then held a brief recess to consider the matter.

¶21. Following the recess, the trial court stated its concern about allowing Bland to testify about what he witnessed when he was four years old in relation to what happened on the night of the shooting:

> [T]hat's all subject to professional testimony of which there is none. So I'm gonna say no, we're not gonna be going into that. I think, one, that's too remote, and, two, there's absolutely no scientific basis that's been set forth to demonstrate that would have any impact upon the defendant some 30 something years later. Now - - and I'm not faced with an expert coming in here and telling me that.

¶22. Afterwards, the State brought to the trial court's attention this Court's decision in *Evans v. State*, 109 So. 3d 1044, 1050 (Miss. 2013), in which this Court reversed a defendant's murder conviction upon finding that the trial court erred by denying the defendant funds to hire an expert on PTSD. The State submitted that out of an abundance of caution based on *Evans*, it would not object to Bland testifying that he has PTSD, but it would object to Bland testifying that witnessing his father's death had caused it.

¶23. In response, defense counsel argued that it was nonsensical to allow someone to say they have PTSD but not to allow them to explain why they have it or where it came from. The trial court then asked defense counsel, "who's here that can testify that PTSD had anything to do with impacting his actions on the night in question?" Defense counsel replied, "Just my client."

6

¶24. After reading and considering *Evans*, the trial court stated for the record that it looked at the pretrial motion for psychiatric examination filed by the defense. The court noted that the motion contained no reference to PTSD; rather, it was limited to Bland's competency to stand trial. The trial court then ruled that it was not going to allow any testimony from Bland regarding PTSD.

¶25. The jury found Bland guilty of murder.[1] Bland appeals, asserting one assignment of error: the trial court erred by excluding Bland's testimony regarding his PTSD, thereby depriving Bland of his opportunity to assert his theory of defense.

## STANDARD OF REVIEW

¶26. We review the trial court's decision to admit or exclude evidence for abuse of discretion. *Smith v. State*, 839 So. 2d 489, 494 (Miss. 2003) (citing *Farris v. State*, 764 So. 2d 411, 428 (Miss. 2000)). We will not reverse the trial court's decision unless it adversely affects a party's substantial right. *Ladnier v. State*, 878 So. 2d 926, 933 (Miss. 2004). Questions of law, however, are reviewed de novo. *Brown v. State*, 731 So. 2d 595, 598 (Miss. 1999).

## DISCUSSION

¶27. Bland argues on appeal that his PTSD was significant in assessing whether he possessed the requisite state of mind to obtain a conviction for first-degree murder. More specifically, Bland contends that his PTSD directly related to whether he was aware of what

---

[1] Bland did not submit a manslaughter instruction, electing instead to have the jury consider only the murder charge. According to the record, defense counsel withdrew any previously submitted jury instructions for manslaughter after consultation with Bland.

7

he was doing and whether he had a "careful and unhurried consideration of the consequences."[2] Bland cites *Evans* for comparison, arguing that *Evans* recognized that evidence of a defendant's PTSD diagnosis was an avenue by which a defendant might argue a theory of lessened culpability before a jury. *See Evans*, 109 So. 3d at 1049 (recognizing that in order to present his imperfect self-defense theory, the defendant needed a PTSD expert who could explain to a jury how PTSD would affect a child's state of mind).

¶28.   *Evans* is distinguishable. In *Evans*, fourteen-year-old Dante Evans was convicted of murder for shooting his father while his father was sleeping. *Id.* at 1045-46. Evans had been diagnosed with PTSD when he was approximately eight years old after witnessing his father abuse his mother on several occasions and allegedly suffering physical abuse himself from his father on at least one occasion. *Id.* at 1046. Prior to trial, defense counsel sought indigent funds to hire a PTSD expert to aid Evans's defense at trial based on the theory of imperfect self-defense. *Id.* at 1047. The trial court denied the request and also denied Evans an imperfect self-defense jury instruction at trial based on lack of evidence to support the theory. *Id.*

---

[2] Bland quotes from jury instruction S-3, which instructed the jury on the deliberate-design element required for murder:

> [D]eliberate design as it is used in these instructions, means an intent to kill without authority of law, and being legally justifiable, or legally excusable. "Deliberate" always indicates full awareness of what one is doing, and generally implies careful and unhurried consideration of the consequences. "Design" means to calculate, plan, or contemplate. "Deliberate design" to kill a person may be formed very quickly, and perhaps only moments before the act of killing the person. However, a "deliberate design" cannot be formed at the very moment of the fatal act.

¶29. This Court reversed Evans's murder conviction, finding that the trial court abused its discretion by denying Evans's request for funds to hire a PTSD expert. *Id.* at 1048. The *Evans* Court found that Evans had demonstrated the need for an expert after presenting evidence of his medical diagnosis of PTSD. *Id.* Evans met his burden of showing an actual need for an expert who could testify to the psychological effects of PTSD, which was necessary for Evans to prepare his theory of defense. *Id.*

¶30. Here, Bland did not seek to present expert testimony regarding PTSD. Rather, Bland sought to introduce his own lay testimony that he suffers from PTSD, which impacted his actions the night of the shooting. We find that the trial court did not abuse its discretion by not allowing it.

¶31. Unlike in *Evans*, and as the trial court found in this case, Bland presented no medical evidence that he has ever been diagnosed with PTSD.[3] Bland argues on appeal, however, that his personal knowledge of PTSD allowed him to testify about it. He contends that under Mississippi law, any "lay witnesses [sic] is competent to testify about evidentiary facts within his or her direct knowledge, including descriptions of personal injuries." Bland cites *Denson v. State*, 746 So. 2d 927 (Miss. Ct. App. 1999).

¶32. We disagree. As the Court of Appeals recognized in *Denson*, this Court has held that, "[a]ny witness is competent to testify who has evidentiary facts within his personal

---

[3] "PTSD is a mental health condition that's triggered by a terrifying event—either experiencing it or witnessing it." *Post-Traumatic Stress Disorder (PTSD)*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/post-traumatic-stress-disorder/symptoms -causes/syc-20355967 (last visited Aug. 11, 2022). "Symptoms may include flashbacks, nightmares and severe anxiety, as well as uncontrollable thoughts about the event." *Id.*

9

knowledge, gained through any of his senses. A nonprofessional witness may describe personal injuries. Physical pain, weakness, exhaustion and the like are matters one may testify about." *Denson*, 746 So. 2d at 938 (quoting *Dennis v. Prisock*, 221 So. 2d 706, 710 (Miss. 1969)). But "a nonexpert or lay witness may not testify as an expert and give expert testimony as to the character or extent of a personal injury which he has sustained . . . ." *Dennis*, 221 So. 2d at 710 (quoting 32 C.J.S. *Evidence* § 546(22) (1964)).

¶33. While a lay person could describe such symptoms to a jury pursuant to Rule 701 of the Mississippi Rules of Evidence, a lay person could not alone characterize these symptoms as a PTSD medical diagnosis. That would require someone with specialized knowledge of the condition under Rule 702 of the Mississippi Rules of Civil Procedure.[4]

¶34. Without anything provided to the trial court other than Bland's claim that he was taking medication for PTSD at the time of trial, the trial court acted within its discretion by not allowing Bland to testify that he suffers from PTSD. Further, Bland did not provide or proffer what his lay testimony would be on the subject. "When testimony is not allowed at trial, a record of the proffered testimony must be made in order to preserve the point for appeal." *Green v. State*, 89 So. 3d 543, 554 (Miss. 2012) (internal quotation marks omitted) (quoting *Metcalf v. State*, 629 So. 2d 558, 567 (Miss. 1993)).

---

[4] In *Evans*, Dr. Beverly Smallwood, a psychologist who had examined Evans to determine his competency to stand trial as well as whether he was sane at the time of his offense, had informed Evans's defense counsel that while she could recognize the symptoms of PTSD, she did not have the expertise to explain to a jury PTSD's effects on a person's mental state. *Evans*, 109 So. 3d at 1048.

¶35. That the State had no objection at trial to Bland mentioning that he suffers from PTSD is inconsequential. "Matters concerning the relevance and admissibility of evidence in general are within the sound discretion of the trial court judge." *Hughes v. State*, 735 So. 2d 238, 260 (Miss. 1999) (citing *Fisher v. State*, 690 So. 2d 268, 274 (Miss. 1996)).

¶36. The prosecutor misinterpreted this Court's holding in *Evans*. *Evans* was limited to the issue of the trial court's denial of funds for a PTSD expert to assist in the defendant's imperfect self-defense claim. *Evans*, 109 So. 3d at 1050. And as mentioned, evidence had been presented to the trial court in *Evans* that the defendant had been medically diagnosed with PTSD. *Id.* at 1049. For all that was presented to the trial court here, the trial court correctly found that *Evans* was inapplicable.

¶37. For these reasons, we find no merit to Bland's claim that the trial court erred by denying him leave to give lay testimony regarding PTSD.

**CONCLUSION**

¶38. Bland's conviction for murder is affirmed.

¶39. **AFFIRMED.**

**RANDOLPH, C.J., MAXWELL, CHAMBERLIN AND GRIFFIS, JJ., CONCUR. KITCHENS, P.J., CONCURS IN PART AND IN RESULT WITH SEPARATE WRITTEN OPINION JOINED BY KING, P.J., COLEMAN AND ISHEE, JJ.**

**KITCHENS, PRESIDING JUSTICE, CONCURRING IN PART AND IN RESULT:**

¶40. Respectfully, I concur in part and in result. I would hold that the trial court erred by denying Bland's request to provide lay testimony of facts within his direct knowledge related

11

to his treatment for PTSD. But because this denial did not result in reversible error in this case, I agree with the majority's decision to affirm Bland's conviction for first-degree murder.

¶41. Mississippi Rule of Evidence 701 permits lay testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Rule 701 permits the admission of lay testimony that provides facts known from the witness's first-hand knowledge or observation. MRE 701 advisory comm. n.; *Wells v. State*, 604 So. 2d 271, 278 (Miss. 1992). This Court has treated the facts and circumstances of an individual receiving medical treatment as permissible lay testimony. *Chaupette v. State*, 136 So. 3d 1041, 1047 (Miss. 2014).[5]

¶42. I would find that Bland's testimony that he was in therapy and on medication for PTSD at the time of trial meets the requirements for the admission of lay testimony and, therefore, should have been permitted. These were facts within Bland's direct knowledge, and a defendant's subjective state of mind is highly probative to an imperfect self-defense theory.[6] Moreover, the State had no objection to Bland's testifying to these facts, directing

---

[5] *See also* **Griffin v. McKenney**, 877 So. 2d 425, 440 (Miss. Ct. App. 2003) (surgeon's testimony was lay testimony to the extent it was "solely explanatory of [the doctor's] treatment of [the patient] and of his records and nursing records about [the patient's] care"), *cert. denied*, 878 So. 2d 67 (Miss. 2004) (table); **Rickman v. State**, 150 So. 3d 983, 986 (Miss. Ct. App. 2014) (A lay witness "is competent to testify about evidentiary facts within his or her direct knowledge, including descriptions of personal injuries."), *cert. denied*, 150 So. 3d 708 (Miss. 2014) (table).

[6] *See* **Ronk v. State**, 172 So. 3d 1112, 1126 (Miss. 2015) (Kitchens, P.J., specially concurring) (the tenured standard for imperfect self-defense manslaughter is "that [the

12

the court's attention to *Evans v. State*, 109 So. 3d 1044 (Miss. 2013). As other jurisdictions have acknowledged, the failure to admit lay testimony can be reversible error. *See United States v. Goodman*, 633 F.3d 963 (10th Cir. 2011) (trial court inappropriately limited witness's lay testimony of defendant's mental deterioration in months before crime); *State v. Banks*, 318 507 P.3d 787, 791 (Or. Ct. App. 2022) (lay testimony of past episodes of defendant's memory loss was not "scientific evidence" and should have been admitted, warranting reversal). Lay testimony is admissible and valuable to assist the jury in evaluating an insanity defense. *Groseclose v. State*, 440 So. 2d 297, 301 (Miss. 1983).

¶43.    I recognize, of course, that a scientific opinion on the effect of PTSD on Bland's state of mind at the time of the shooting should come from the testimony of a qualified expert under Rule 702.[7] *See Russell v. State*, 729 So. 2d 781 (Miss. 1997). As *Evans* demonstrates, this Court recognizes the legitimacy of PTSD as a condition that can affect a person's state of mind sufficient to support a finding of diminished capacity. *See Evans*, 109 So. 3d 1044. In *Evans*, we reversed a criminal conviction because the defendant's pretrial request for funds for a PTSD expert should have been granted. *Id.* at 1045.[8]

---

defendant] killed the deceased without malice, under the bona fide belief, *but without reasonable cause therefor*, that it was necessary for him so to do in order to prevent the appellant from inflicting death or great bodily harm upon him; . . . ." (alterations in original) (internal quotation marks omitted) (quoting *Lanier v. State*, 684 So. 2d 93, 97 (Miss. 1996)).

[7] For a detailed example and discussion of an expert's testimony on PTSD and how the condition can result in an actor's diminished capacity, see *State v. Bottrell*, 14 P.3d 164, 170 (Wash. Ct. App. 2000).

[8] *See also Alexander v. State*, 333 So. 3d 19, 31 (Miss. 2022) (Kitchens, P.J. dissenting) ("Fundamental fairness requires the State to provide 'the "basic tools of an adequate defense"'" to defendants unable to pay for them. (quoting *Ake v. Oklahoma*, 470

13

¶44. But here, Bland did not request funds for an expert or present an expert at trial. He did not pursue an insanity defense,[9] and after consultation with counsel, he did not request a manslaughter instruction. He submitted no documentation of any medical evaluation or condition, and he did not make a proffer to lay a foundation for what his testimony would have demonstrated. Bland was granted (over the State's objection) a self-defense instruction on "accident and misfortune," and he took the witness stand at trial to provide detailed testimony of his version of the shooting. "Harmless-error analysis prevents 'setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.'" *Smith v. State*, 136 So. 3d 424, 435 (Miss. 2014) (quoting *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)).

¶45. I would find that the trial court erroneously denied Bland's request to testify to facts within his direct personal knowledge regarding his treatment for PTSD. But on the record

---

U.S. 68, 77, 105 S. Ct. 1087, 84 L. Ed. 2d 53 (1985) (quoting *Britt v. North Carolina*, 404 U.S. 226, 227, 92 S. Ct. 431, 30 L. Ed. 2d 400 (1971)))).

[9] Bland did move pretrial for a mental evaluation. At the hearing on the motion (which was denied), Bland's mother testified that Bland witnessed her shoot and kill his father in a domestic violence incident when Bland was a young child. His mother also testified that throughout his life (including as an adult) Bland had exhibited strange states of mind, such as thinking that he saw "Egyptian" faces in the window curtains and talking back to the faces in a made-up language he thought was Egyptian. He also had an acute fear of airplanes and thought that airplanes were eavesdropping on him when flying overhead. She also testified that at one point the casino where he worked required him to get a mental evaluation due to his hands shaking when he tried to perform his job as a card dealer. The trial court concluded that the type of behavior described could be relevant to Bland's state of mind for purposes of presenting a defense at trial but that it was not relevant to competency.

before us on direct appeal,[10] this was not reversible error. Therefore, I concur in part and in result.

**KING, P.J., COLEMAN AND ISHEE, JJ., JOIN THIS OPINION.**

---

[10] The question of counsel's effectiveness in preparing a defense may be raised in a motion for post-conviction relief.